**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**ONE URBAN LOT LOCATED AT 1 STREET A–1, VALPARAISO, BAYAMON, PUERTO RICO, etc., et al., Defendants, Appellees.**

**R.G. Mortgage Corp.,
Claimant, Appellant.**

**Nos. 88–1071, 88–1193 and 88–1194.**

United States Court of Appeals,
First Circuit.

Heard Sept. 12, 1988.

Decided Jan. 10, 1989.

Antonio M. Bird, Jr., with whom Bird & Bird, San Juan, was on brief, for claimant, appellant.

Miguel A. Fernandez, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and ATKINS,* Senior District Judge.

TORRUELLA, Circuit Judge.

In 1981 Angel and Elena Cartagena (the "Cartagenas") purchased a residence in the Valparaíso development in Bayamón, Puerto Rico, assisted by a $67,000, 30 year loan from claimant-appellant R.G. Mortgage Corp. ("R.G."). The residence was encumbered by a mortgage. It was recorded as a first mortgage on the property in the Registry of the Property of Puerto Rico, Second Section of Bayamón. The mortgage was secured by a guarantee issued by the Veterans Administration. The deed of

---

* Of the Southern District of Florida, sitting by designation.

mortgage did not require that R.G. approve a subsequent sale of the property.[1]

On February 14, 1986, the Cartagenas sold the property to José Valentín López Nieves ("López") and his wife. No transfer of the lien, or any such procedure, was expedited. The only change, from R.G.'s perspective, was a change of the record owner.

Shortly after López purchased the property he was indicted for drug-related criminal activity and on August 19, 1986, the United States filed a complaint of forfeiture in rem against several vehicles and real estate properties belonging to López, including the Valparaíso residence. It is undisputed that López bought the residence with proceeds traceable to an exchange for a controlled substance and that it was used or intended to be used to commit or facilitate the commission of a violation under Chapter 13(I) of 21 U.S.C.

On October 2, 1986, a U.S. Marshal served upon R.G. through its vice-president, Juan José Díaz, a copy of an amended complaint and warrant of arrest in rem concerning the Valparaíso property. The warrant of arrest stated that the "owners" or "possessors" of the property had 10 days to file a written claim and 20 days thereafter to file a responsive pleading. The amended complaint listed pursuant to 21 U.S.C. § 881(a)(6) the items of property to be forfeited. Díaz, based on his experience of eleven years in the mortgage industry, and on his understanding that R.G. was a mortgage creditor, not an owner, a possessor or a named party, deemed the complaint to be only against López' interest in the property and did not refer the papers to counsel. In a sworn statement Díaz further explained that from his experience, he understood that, except for a property tax lien (created by statute), mortgage liens remain unaffected by proceedings to enforce liens subsequently recorded in the Registry of Property. Díaz' understandings, based on current practices of the mortgage industry, were not disputed by the government.

Meanwhile, during the months of October and November, the government moved for the issuance of, and eventually published a warrant for seizure and monition in a newspaper of general circulation. The warrant stated that interested persons had to file their claims by December 10, 1986. Since the criminal proceedings against López were in progress, the government moved for a stay of the forfeiture proceedings pursuant to 21 U.S.C. § 881(i),[2] which motion was granted by the court on December 2, 1986.[3]

We backtrack a bit to retrace this trail from R.G.'s perspective. By August, 1986, López had stopped making mortgage payments to R.G., upon which the latter began collection efforts, first through R.G. employees or agents, and eventually by referral to counsel. Counsel discovered the status of the forfeiture proceedings and explained it to R.G. officials. By then, the newspaper notice with the December 10 deadline had been issued, as well as the stay, effective December 2. R.G. under-

---

1. According to R.G., and unopposed by the government, Veterans Administration required, *inter alia* the following:

   "a. Right to Sell. *The law gives the owner of property* which is security for a guaranteed or insured loan (whether the owner be the original veteran or a transferee) *the right to sell the property to anyone or on any terms.* This is a valuable right since it influences the price which the owner can obtain for the property and makes it much easier to dispose of the property. Consequently, VA cannot condone any restriction, charge or fee imposed by a holder or its servicing agent which has the effect of limiting or nullifying this right." Sworn statement of R.G.'s vice-president Juan José Díaz, Exhibit C. Appendix, p. 135. (Emphasis supplied).

2. Section 881(i) states:

   Stay of civil forfeiture proceedings
   (i) The filing of an indictment or information alleging a violation of this subchapter or subchapter II of this chapter, or a violation of State or local law that could have been charged under this subchapter or subchapter II of this chapter, which is also related to a civil forfeiture proceeding under this section shall, upon motion of the United States and for good cause shown, stay the civil forfeiture proceeding.

3. That stay would be completely lifted, upon motion by the government, on August 11, 1987.

stood the stay to proscribe *any* papers related to the civil forfeiture. Here the stories meet: on March 6, 1987, R.G. filed a motion for leave to make late filing of the claim and answer, and other papers, including a claim and an answer to the amended complaint.

On March 20, 1987, the government filed a motion requesting, *inter alia,* that the court refrain from considering R.G.'s motion while the stay was in effect. The motion was granted on May 11, 1987. On July 14, 1987, the government requested that the stay be lifted for the exclusive purpose of establishing the validity of R.G.'s and others' claims. On July 22, 1987, the government moved to strike R.G.'s claim and answer and requested issuance of a partial decree of forfeiture covering the Valparaíso property. The court struck R.G.'s claim and answer and, on August 28, 1987, it issued a partial decree of forfeiture.

Several motions ensued, which reflected at some times confusion on the part of R.G. as to what rights were actually determined. The district court, to clarify the confusion and to facilitate the parties' procedural stance, issued an order on December 18, 1987, ordering that a "decree of default and forfeiture entered on August 28, 1987, be amended to provide that it constitutes a final judgment granting the forfeiture requested by the United States as to the Valparaíso property." The court also certified, pursuant to Fed.R.Civ.P. 54(b), that the order constituted a final judgment granting the forfeiture requested by the United States over the Valparaíso property. It is the August 28, 1987 order, as clarified and amended on December 18, 1987, that is before us on appeal.

*Discussion*

The standard applicable to set aside an order of default is "good cause." Fed.R. Civ.P. 55(c). This is the standard applicable to this case since when R.G. appeared final judgment had not been entered. Fed. R.Civ.P. 54(b). We have stated repeatedly that motions to set aside default judgments are left to the sound discretion of the district court and that appellate courts will not reverse the district court's decision unless clearly wrong. *Taylor v. Boston and Taunton Transp. Co.,* 720 F.2d 731, 732 (1st Cir.1983). The relevant factors to be considered in determining whether there is "good cause" are whether the default was willful, whether setting aside the default will prejudice the other party and whether there is a meritorious defense. *See* 6 *Moore's Federal Practice,* ¶ 55.10 (1988); *U.S. v. One Parcel of Real Property,* 763 F.2d 181 (5th Cir.1985). We shall consider them in that order.

First, we address whether R.G.'s default was willful. At first glance, it appears so. Upon being served by papers that announced the imminent forfeiture of a property on which it had an interest, R.G. put the papers away. Such seemingly lackadaisical conduct, however, gains some respect when viewed in the context of Puerto Rico mortgage law and practice. R.G. argues, supported by Puerto Rico law, 30 L.P.R.A. § 2001 *et seq.* (1987) (an argument undisputed by the government), that properly recorded rights, having the procedural safeguards of a strict Registry system, are presumed as extant in the Registry. 30 L.P.R.A. § 2354. Lienholders of properly recorded property interests will thus have priority over all others. *Id.* §§ 2354–59. This presumption is the basis for the "fe registral," the public faith in the Registry of Property, which allows reliance by all parties engaging in real property transactions. Thus Mr. Diaz' statement gains credence:

> Through my eleven years of experience in the mortgage industry in Puerto Rico it has been my understanding that except for a property tax lien created by statute, a mortgage lien remains unaffected by any proceeding to enforce a lien subsequently recorded in the Registry of Property. It has been my understanding that this principle is applicable to subsequent liens originating in Federal Statutes, such as attachments to secure Social Security and Federal Income Tax debts. In fact in my eleven years of experience in the mortgage industry in Puerto Rico I have never known or heard of a situation where a properly recorded

mortgage was cancelled or affected by a proceeding to enforce a lien or ownership title that was recorded in the Registry subsequent to the mortgage.

Also, R.G. points out that it is not a named party in the complaint and that the complaint and warrant of arrest in rem admonishes only "owners and possessors," terms R.G. mistakenly believed excluded mortgage creditors. Thus, R.G.'s mistake, albeit hardly exemplary of diligent conduct, shows no disrespect towards the court proceedings and clearly does not reach the government's repeated contention of "gross negligence."

As a second major consideration, we gauge the harm imposed on the government by R.G.'s delay. We find none whatsoever. Indeed, when R.G. first tried to appear, not only was the stay requested by the government still in effect, but the government requested that R.G.'s claim not be considered until the stay was lifted. Thus, the government cannot allege procedural harm in the form of needless delay.

Thus we reach the third concern, the presence of a meritorious defense. The government relies on *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) to argue that R.G. is barred from using the defense of "innocent lienholder," which is arguably the principal defense available to R.G. That the forfeiture provisions of 21 U.S.C. § 881 admit the defense of innocent lienholder is clear from the text of § 881(a)(6), which allows forfeiture of:

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, *except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.* (Emphasis added). A lienholder is an "owner" for purposes of § 881(a)(6). *United States v. Metmor Financial, Inc.*, 819 F.2d 446, 448 n. 2 (4th Cir.1987).

The government argues R.G. does not qualify as an innocent lienholder because the Court in *Calero–Toledo* defined "innocent lienholder" as "an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." 416 U.S. at 689, 94 S.Ct. at 2094–2095. Although the government doesn't challenge the clean hands of R.G., it argues that R.G. was at fault for not having done all it reasonably could to prevent the wrongful ownership and use of the property.

The reference to *Calero–Toledo* seems inapposite. The case involved a Puerto Rico forfeiture statute as applied to a lessor of a yacht. The Court upheld the constitutionality of the statute even as applied to the lessor who had no knowledge of the illegal activity. It is in considering the constitutionality of the Puerto Rico statute that the court sets out the limits of the forfeiture powers of the state. Here, however, we have a statute that provides for an exception for innocent owners. 21 U.S.C. § 881(a)(6). This statute does not in any way limit innocent owners to those who have done "all that reasonably could be expected to prevent the proscribed use of the property." *Calero–Toledo*. In fact, the statute specifically refers to the knowledge and consent of the owner as the appropriate considerations in determining who is excepted.

Even applying *Calero–Toledo*, it is clear that R.G. did "all that reasonably could be expected to prevent the proscribed use of its property" since under Veterans Administration requirements, *supra*, it could not restrict the right of the previous owner to sell the property to anyone.

We find the court abused its discretion in not allowing R.G. to file the late claim and in entering judgment by default. Absent

prejudice to the government, and considering that the claimant presented both a tenable excuse and a meritorious defense, there was no reason not to allow R.G. to litigate its claim.[4]

The judgment is *vacated* and the case is *remanded* for consideration of R.G.'s claim on its merits.

Costs are granted in favor of appellant.

**4.** Because we find that the district court erred in not allowing RG to file a late claim, we do not address RG's argument that the government's service of process on the property and on RG was "insufficient and invalid."